■ In the Matter of the Estate of MURIEL M. NEALON, Deceased. CHRISTOPHER J. NEALON, as Executor of MURIEL M. NEALON, Deceased, Appellant; PETER J. NEALON et al., Respondents. [870 NYS2d 578]—

Cardona, P.J.

Petitioner, the executor of the estate of his late mother (hereinafter decedent), commenced this proceeding pursuant to SCPA 2103 against one of his two brothers, respondent Peter J. Nealon (hereinafter respondent), and respondent's wife in order to, among other things, determine the legitimacy of certain disbursements to respondents from decedent's bank accounts prior to her death and, if necessary, recover them for the estate. The record shows that, following her husband's death in May 2001, decedent lived by herself until September 2002 when she moved into respondents' home after being diagnosed with the beginning stages of dementia of the Alzheimer's type. It appears this decision was prompted by decedent's increasing difficulties with forgetfulness or confusion which, according to her physician, would "wax and wane" from day to day. Shortly after decedent moved in, respondents initiated construction of an addition to their home, which included a large master bedroom suite for themselves as well as a bedroom and handicapped-accessible bathroom for decedent on the ground floor. The addition was completed in approximately May 2003. During that period and afterwards, decedent's condition grew progressively worse. After a bout with a sepsis infection requiring a hospital stay in February 2004, decedent spent a period of time in a nursing home before she returned to respondents' home, where she passed away in May 2004.

Shortly before decedent's death, petitioner began making inquiries about the whereabouts of money that had been withdrawn from decedent's bank accounts, principally through checks made out to respondents, along with automatic teller machine transactions, which were all disbursed during the period of time that she lived with them.[1] Dissatisfied with respondents' responses, petitioner commenced this proceeding in January 2005 asserting two causes of action: the first claiming that decedent suffered from diminished mental capacity at the time of the subject transactions and the second containing allegations sounding in undue influence. Respondents main-

---

1. Notably, at the time she began residing with respondents, decedent's Charter One Bank account had a balance of approximately $92,000, with no withdrawals made in the preceding two-year period and only interest payments deposited. Decedent's Key Bank checking account had a balance of approximately $14,800 at that time, and her records demonstrate that approximately $2,400 in pension and Social Security payments were directly deposited into that account every month. Between November 2002 and March 2004, approximately $92,600 was withdrawn from the Charter One Bank account, leaving a balance of approximately $64. Furthermore, at the time of decedent's death, there was less than $2,000 left in her Key Bank checking account.

tained that, until she became incapacitated shortly before her death, decedent had voluntarily signed all checks and approved all withdrawals from the accounts for expenditures such as assisting respondents with the cost of the addition to their home, their taxes and monthly bills, various gifts and helping to pay for respondents' wedding. Following discovery, respondents moved for summary judgment dismissing the petition. Surrogate's Court granted the motion, prompting this appeal.

Initially, petitioner argues that Surrogate's Court erred in dismissing his claim premised upon decedent's alleged incapacity. A person's competency to engage in a transaction is presumed and the party challenging such bears the burden of proving incompetence (*see Sears v First Pioneer Farm Credit, ACA*, 46 AD3d 1282, 1284-1285 [2007]). Additionally, a diagnosis of progressive dementia, standing alone, does not create a triable issue of fact as to mental capacity (*see Matter of Friedman*, 26 AD3d 723, 725 [2006], *lv denied* 7 NY3d 711 [2006]). Instead, it must be demonstrated that the individual was incompetent at the specific time of the challenged transaction, i.e., he or she was "so affected as to render him [or her] wholly and absolutely incompetent to comprehend and understand the nature of the transaction" (*Feiden v Feiden*, 151 AD2d 889, 890 [1989] [internal quotation marks and citation omitted]).

Here, while petitioner did provide some proof supporting his claim that decedent had diminished competency during the relevant time period, we agree with Surrogate's Court that the evidence was insufficient to withstand summary judgment given the lack of proof in the record concerning decedent's capacity at the time of the *specific* money transactions at issue herein. Notably, while decedent's physician, Robert Donahue, testified as to decedent's progressive deterioration, he also clearly stated that individuals with decedent's condition would have lucid moments and waning moments; therefore, the fact that she lacked capacity on one day would not mean that she could not be considered competent on the next. Consequently, in light of the failure to show proof rebutting the presumption in favor of competency, Surrogate's Court did not err in dismissing the diminished mental capacity cause of action.

Turning to the claim alleging undue influence, however, we reach a different result and conclude that factual issues preclude summary judgment (*see Matter of Johnson*, 6 AD3d 859, 861 [2004]).[2] Here, petitioner and other witnesses testified as to decedent's increasing confusion during the relevant period and

---

**2.** We note, however, our disagreement with petitioner's contention that respondents must be held to a higher level of conduct commensurate with

her susceptibility to verbal suggestion, a situation supported by Donahue's testimony. Prior to moving in with respondents, the record indicates that decedent treated her three sons equally and was very independent and frugal with her money, always living below her means. After the move, however, she became almost completely dependent on respondents, who took over decedent's finances, healthcare and personal needs. At that time, according to some witnesses, respondents began spending money on things allegedly beyond their means, such as jewelry, vacations and other outings, as well as the addition to their home.

Notably, respondents were vague or unresponsive when questioned about many of the specific withdrawals or transactions at issue herein. While respondents maintain that decedent wanted to contribute her "portion" or "share" of the cost of the addition that added her bedroom and bathroom to the home, at no point did respondents claim that decedent said she would pay for it in its entirety as a gift to them. Nor did respondents provide an explanation as to what part of the total cost of the project constituted decedent's "share." In fact, although questioned under oath, respondent did not provide a figure as to the total cost of the addition, although at various times he mentioned estimates between $60,000 and $85,000. When asked about numerous large withdrawals from decedent's accounts after the addition was completed, respondent had no explanation.

Significantly, petitioner testified that, in March 2004, when he met with respondent about the missing money, respondent "indicated he would make restitution." According to petitioner, respondent made no mention of receiving gifts from decedent and, instead, told him that he "basically took [his] inheritance early" and "deserved this money because he was treated as a second-class citizen" in the family. During his deposition testimony, respondent acknowledged meeting with petitioner and indicating to him that, since he could not "account for" $70,000 of their mother's money, he was willing to renounce his right to inherit one third of decedent's estate. Since we conclude that direct and circumstantial proof in the record (*see Matter of Paigo*, 53 AD3d 836, 839-840 [2008]) raised triable issues of fact regarding the allegations of undue influence, summary judgment was inappropriate on this cause of action (*see Matter of Johnson*, 6 AD3d at 861).

that imposed on attorneys-in-fact. While the record indicates that a document granting respondents power of attorney was executed in February 2003, there is no proof disputing respondents' testimony that said power of attorney was never used until February 2004, well after the transactions of which petitioner complains.

The remaining issues raised by petitioner are either unpersuasive or unnecessary to reach given the above disposition.

Peters, Carpinello, Kavanagh and Stein, JJ., concur. Ordered that the order is modified, on the law, without costs, by reversing so much thereof as granted respondents' motion for summary judgment dismissing the undue influence cause of action; motion denied to that extent; and, as so modified, affirmed.