Matter of Giaquinto (2018 NY Slip Op 06065)





Matter of Giaquinto


2018 NY Slip Op 06065


Decided on September 13, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: September 13, 2018

525498

[*1]In the Matter of EDWARD. GIAQUINTO, Deceased. CYNTHIA A. JOHNSON, Respondent; JOANN FARINA, Appellant. (And Another Related Proceeding.)

Calendar Date: June 6, 2018

Before: Devine, J.P., Clark, Mulvey, Rumsey and Pritzker, JJ.


Parisi, Coan & Saccocio, PLLC, Schenectady (Chelsea Swilling of counsel), for appellant.
Couch White, LLP, Albany (Donald J. Hillmann of counsel), for respondent.



MEMORANDUM AND ORDER
Pritzker, J.
Appeals (1) from a decree of the Surrogate's Court of Schenectady County (Versaci, S.), entered October 18, 2016, which admitted to probate an instrument purporting to be the last will and testament of decedent, and (2) from an order of said court, entered November 10, 2016, which denied respondent's motion to set aside the verdict.
In 2003, Edward V. Giaquinto (hereinafter decedent) executed a will leaving his entire estate to his wife, Marilyn
Giaquinto (hereinafter Giaquinto), or, if she predeceased him or did not survive him by 60 days, in equal shares to 11 of Giaquinto's nieces and nephews; his 2003 will made no provision for any of decedent's blood relatives, and Giaquinto and decedent had no children. In 2013, after consulting with their financial advisor, Thomas Appleton, decedent and Giaquinto decided to update their estate plan by forming a trust for their intended beneficiaries delineated in the 2003 will [FN1]. The attorney for the couple, Judith Singer, prepared estate documents reflecting their plan; [*2]however, Giaquinto suddenly and unexpectedly died on July 1, 2013 prior to their execution. Thereafter, the documents were revised to reflect Giaquinto's death, and, on July 24, 2013, they were executed by decedent.
Decedent died on February 1, 2014. Petitioner, who was nominated as executor, offered the 2013 will for probate. Respondent challenged the validity of this will, claiming fraud, undue influence and lack of testamentary capacity [FN2]. Petitioner moved for summary judgment dismissing the objections, which respondent opposed. Respondent also cross-moved for partial summary judgment seeking a determination that the fiduciary relationship between decedent and petitioner created a confidential relationship. In August 2016, Surrogate's Court denied petitioner's motion for summary judgment as to fraud and undue influence and granted the motion as to decedent's lack of testamentary capacity. The court denied respondent's cross motion.
After trial, the jury determined that the 2013 will was free of fraud and undue influence and that there was no confidential relationship between decedent and petitioner. Surrogate's Court entered a decree admitting the 2013 will to probate and issued letters testamentary to petitioner. Thereafter, respondent moved to set aside the verdict and to direct judgment in her favor on the ground that the jury's verdict was contrary to the weight of the evidence; the court denied said motion. Respondent appeals and we affirm.
Turning first to the challenge to decedent's testamentary capacity, the burden rests with petitioner, as the moving party, to demonstrate that decedent "understood the consequences of executing the will, knew the nature and extent of the property being disposed of and knew the persons who were the natural objects of his bounty[] and his relationship to them" (Matter of Prevratil, 121 AD3d 137, 140 [2014] [internal quotation marks, brackets and citation omitted]; see Matter of Kumstar, 66 NY2d 691, 692 [1985]). Here, petitioner submitted, among other things, a copy of the 2013 will, along with the self-executing affidavits of Singer and her paralegal, Angela Goforth — the subscribing witnesses who attested to decedent's sound mind, memory and understanding when he signed the will — which "created a presumption of testamentary capacity and prima facie evidence of the facts attested to" (Matter of Walker, 80 AD3d 865, 866 [2011], lv denied 16 NY3d 711 [2011]; see Matter of Prevratil, 121 AD3d at 141). Petitioner also proffered the SCPA 1404 hearing transcript of Singer, who testified that, based on her personal observations and interactions, decedent affirmed that the contents of the will fulfilled his wishes, that he was able to sign the will and that he appeared to be lucid and sober. Singer testified succinctly that decedent "seemed very clear on what he had, what he owned, who he cared about, [and] who he wanted to leave things to." Additionally, Goforth testified that, on the day of the signing, decedent was in "good spirits," was acting with a clear mind, engaged in rational speech and was alert. Furthermore, petitioner submitted the affidavit of Appleton, who had known decedent for 25 years and was also present when decedent signed the 2013 will. Appleton averred that decedent "was of sound mind, memory and understanding and not under any restraint or in any respect incompetent to make a will." Petitioner also submitted the affidavit of Robert Halbig, decedent's primary care physician for 25 years, who averred that decedent "had sufficient capacity during the summer of 2013 to understand who his [*3]loved ones were, to understand the general nature and extent of his assets[] and to make a rational choice regarding how to leave those assets at his death."
To meet her shifted burden to produce evidence demonstrating a material issue of fact (see Matter of Cameron, 126 AD3d 1167, 1168 [2015]; Matter of Scaccia, 66 AD3d 1247, 1250 [2009]), respondent focused upon decedent's "greatly reduced physical, mental and cognitive abilities in the period of time leading up to and following the execution of the 2013 [w]ill." Among the medical records proffered by respondent is a neuropsychological evaluation conducted in July 2012, a year prior to the 2013 will execution, by Mark Rogerson, who diagnosed decedent with "moderate dementia" and highlighted decedent's "broad and progressive nature of . . . cognitive difficulties, as well as his notable deficits in memory, orientation, semantic retrieval[] and conceptual reasoning[, which] are strongly suggestive of Alzheimer's disease." Respondent also submitted the deposition of Carl Linkinhoker, decedent's close friend, who testified that he witnessed decedent's mental health deteriorate in the fall of 2013. However, evidence of decedent's diagnosis of dementia and declining cognitive abilities "does not, without more, create a question of fact on the issue of testamentary capacity, as the appropriate inquiry is whether the decedent was lucid and rational at the time the will was signed" (Matter of Prevratil, 121 AD3d at 141 [internal quotation marks and citation omitted]; see Matter of Paigo, 53 AD3d 836, 838 [2008]).
Respondent has failed to present any evidence, including the medical records and affidavits, that showed that decedent lacked the testamentary capacity or mental competency at the time of the execution of the 2013 will. To the contrary, Linkinhoker, Halbig and those present during the execution of the 2013 will stated that decedent was lucid and demonstrated a sound mind. In fact, Linkinhoker testified that decedent "was very clear" cognitively and appeared lucid and sober during the summer of 2013, even after Giaquinto's passing, and, during this time, decedent showed Linkinhoker three or four computers that decedent had built and connected with a wireless box. In addition, decedent's medical records were examined post-litigation, at the behest of the estate, by Earl Zimmerman, a doctor who specializes in, among other things, "memory loss, confusional states [and] Alzheimer's disease." Zimmerman opined, in an affidavit, that nothing in decedent's medical records or neuropsychological evaluation indicated that he lacked testamentary capacity in either 2012, when he underwent the evaluation, or in July 2013, when he executed the will. Therefore, inasmuch as respondent failed to raise a triable issue of fact regarding decedent's testamentary capacity at the time the 2013 will was signed, Surrogate's Court properly granted petitioner's summary judgment motion as to this issue (see Matter of Romano, 137 AD3d 922, 923 [2016]; Matter of Johnson, 6 AD3d 859, 860-861 [2004]).
Respondent next contends that Surrogate's Court erred by denying her cross motion seeking a determination that a fiduciary relationship existed between decedent and petitioner as a matter of law solely on the basis that decedent had named petitioner as a successor agent in the 2003 power of attorney. We disagree. It is true that "[w]here there is a confidential relationship between parties to a transaction, . . . the burden shifts to the stronger party in such a relationship to prove by clear and convincing evidence that a transaction from which he or she benefitted was not occasioned by undue influence" (Matter of Bonczyk v Williams, 119 AD3d 1124, 1125 [2014] [internal quotation marks, brackets and citation omitted]; see Dwyer v Valachovic, 137 AD3d 1369, 1371 [2016]). Here, however, respondent offered no proof that petitioner had acted as decedent's attorney-in-fact pursuant to the 2003 power of attorney prior to decedent's execution of the 2013 will. A power of attorney, standing alone, is insufficient to establish the existence of a confidential relationship or to shift the burden of proof regarding undue influence (see Dwyer v Valachovic, 137 AD3d at 1371; Matter of Bonczyk v Williams, 119 AD3d at [*4]1127). Indeed, even acknowledged use of a power of attorney to pay the principal's bills is not necessarily evidence of a confidential relationship (see Matter of Bonczyk v Williams, 119 AD3d at 1127).
Respondent next claims that Surrogate's Court made several erroneous evidentiary rulings that deprived her of a fair trial. Specifically, she argues that Surrogate's Court improperly prohibited her counsel from asking leading questions during direct examination of petitioner. "While an adverse party who is called as a witness may be viewed as a hostile witness and direct examination may assume the nature of cross-examination by the use of leading questions, whether to permit such questions over objection is a matter which rests in the discretion of the trial court" (Matter of Ostrander v Ostrander, 280 AD2d 793, 793 [2001] [citations omitted]). The record discloses that petitioner was not reluctant or evasive in answering questions and that respondent's counsel had the opportunity to elicit the information sought through questions that were not leading. We further note that as the direct examination of petitioner proceeded, the court permitted respondent's counsel to ask numerous leading questions. Thus, we conclude that Surrogate's Court did not abuse its discretion in this regard. We have considered respondent's remaining arguments regarding alleged evidentiary errors and find them to be unavailing.
Finally, we reject respondent's contention that Surrogate's Court improperly denied her motion to set aside the jury's verdict finding that there was no confidential relationship between decedent and petitioner. "A jury verdict may be set aside as against the weight of the evidence only when the evidence preponderates so greatly in the movant's favor that the jury could not have reached its conclusion on any fair interpretation of the evidence" (WFE Ventures, Inc. v Mills, 139 AD3d 1157, 1159-1160 [2016] [internal quotation marks and citations omitted]; see Matter of Buchanan, 245 AD2d 642, 643-644, lv dismissed 91 NY2d 957 [1998]). In making our determination, we "defer to the jury's credibility determinations and view the evidence in the light most favorable to the nonmoving party" (Adami v Wallace, 68 AD3d 1397, 1398 [2009]).
A confidential relationship exists between two parties where "they . . . deal[] on unequal terms due to one party's weakness, dependence or trust justifiably reposed upon the other and unfair advantage is rendered probable" (Matter of Nealon, 104 AD3d 1088, 1089 [2013] [internal quotation marks and citation omitted], affd 22 NY3d 1045 [2014]). Here, there is ample evidence supporting the jury's determination that no confidential relationship existed between decedent and petitioner. Notably, petitioner only began assisting decedent with matters involving his care and finances in earnest only a few weeks prior to execution of the will and trust. Prior to her death, Giaquinto managed the couple's finances. After Giaquinto died, petitioner began assisting decedent with paying his bills, and she helped arrange for the home health care services that allowed decedent to continue to live in his home and began acting as decedent's attorney-in-fact on June 10, 2013. Significantly, the revised estate plan was formulated prior to Giaquinto's death and was materially consistent with the 2003 will, which likewise made no provision for decedent's family members. Moreover, decedent was neither completely dependent upon petitioner nor isolated, as home health care aides were present in his home 24 hours per day and he regularly had lunch with his sister or a longtime friend.
Notably, respondent does not challenge the jury's verdict finding that petitioner did not exert undue influence over decedent in execution of the will, conceding that, if she bore the burden of proof on that issue, a verdict for petitioner would not be "wholly unreasonable." In any event, the undisputed proof that petitioner had developed and maintained during her lifetime a longstanding and close relationship with Giaquinto and decedent — a childless couple — similar to that of parent and child negated any presumption of undue influence that, under these circumstances, would have arisen had a confidential relationship been established (see Matter of [*5]Antoinette, 238 AD2d 762, 764 [1997]). Thus, Surrogate's Court properly denied respondent's motion to set aside the verdict.
Devine, J.P., and Clark, JJ., concur.




Rumsey, J. (concurring in part and dissenting in part).


We respectfully dissent from that part of the majority's decision as found that Surrogate's Court properly granted summary judgment to petitioner dismissing respondent's objection that Edward V. Giaquinto (hereinafter decedent) lacked testamentary capacity.
"As to testamentary capacity, [the will's proponent has] the initial burden of establishing that [the] decedent understood the nature and consequences of making the will, the nature and extent of [his or] her property, and the natural objects of [his or] her bounty" (Matter of Vosilla, 121 AD3d 1489, 1490-1491 [2014] [citations omitted]). We agree that petitioner met her prima facie burden to produce evidence of decedent's testamentary capacity, thereby shifting the burden to respondent to demonstrate a triable issue of fact. However, "[s]ummary judgment is rare in a contested probate proceeding and where, as here, there is conflicting evidence or the possibility of drawing conflicting inferences from undisputed evidence, summary judgment is inappropriate" (Matter of Paigo, 53 AD3d 836, 838 [2008] [internal quotation marks and citations omitted]; see Matter of Vosilla, 121 AD3d at 1490). Although a diagnosis of dementia, standing alone, is insufficient to create a triable issue of fact regarding mental capacity (see Matter of Bordell, 162 AD3d 1262, 1264 [2018]; Matter of Nealon, 57 AD3d 1325, 1327 [2008]), where, as here, there is proof of a progressively worsening mental condition, evidence of specific facts that occur close in time to execution is probative of testamentary capacity at the relevant time and is sufficient to establish a triable issue of fact (see e.g. Matter of Buchanan, 245 AD2d 642, 645-646 [1997], lv dismissed 91 NY2d 957 [1998]). In meeting her burden, respondent relied heavily on evidence that decedent had been diagnosed as suffering from progressive dementia and memory loss that resulted in difficulty performing activities of daily living and communicating effectively in the weeks prior to executing the will.
Decedent was examined twice by Robert Halbig, who had been his primary care physician, in the weeks prior to his execution of the will. In a conclusory, one-page affidavit, Halbig opined that decedent had sufficient testamentary capacity "during the summer of 2013." Notably, however, he did not address decedent's capacity on the date that the will was executed, nor did he explain how he arrived at his opinion, notwithstanding the facts contained in his own records that call decedent's capacity into question. The notes from the June 10, 2013 examination show that Halbig had diagnosed decedent as suffering progressive memory loss. They further document that decedent's wife, Marilyn Giaquinto (hereinafter Giaquinto), had accompanied decedent and reported to Halbig that decedent's "memory is worse," that he was forgetful of names and that he was having increased difficulty with the activities of daily living to the extent of requiring "constant cueing" for meals — a point corroborated by Halbig's observation that decedent had "lost a few pounds since his last visit." Halbig reported that decedent's score on the Mini-Mental State Examination had declined from his last visit to 21/30, that decedent's speech was not spontaneous and that he was "significantly" less fluent.
Halbig next examined decedent on July 9, 2013, only 15 days before decedent executed the will, at which time Halbig noted that decedent was aware that Giaquinto had died and "seem[ed] lost without her." Halbig reported that decedent's score on the same examination further declined, to 18/30, and that his speech was "significantly less spontaneous," with [*6]responses limited to a few simple phrases. Halbig's report that decedent was experiencing difficulty with the activities of daily living in June and July 2013 is particularly relevant to decedent's testamentary capacity in light of the opinion of Earl Zimmerman — a medical doctor who specialized in issues related to memory loss, confusion, Alzheimer's disease and dementia — that a decline in the ability to perform the activities of daily living is an indicator of reduced mental capacity. Zimmerman acknowledged that individuals who, like decedent, suffer from dementia have "good days and bad days[,]" or "periods of confusion followed by periods of lucidity." However, he opined only that decedent "would have had sufficient capacity in the summer of [2013]"; he did not opine whether decedent was lucid or suffering a period of confusion on the date that the will was executed and, further, he failed to explain whether he considered the facts contained in Halbig's medical records that show decedent was experiencing difficulty in remembering names and performing the activities of daily living.
Respondent's claim that decedent behaved inappropriately at Giaquinto's wake may also be considered as further proof that decedent lacked testamentary capacity when he executed the will and the trust less than two weeks later. Respondent alleged that she attended the wake where she observed that decedent did not stand in the receiving line with other family members. She also witnessed him wandering about the funeral home attempting to joke with individuals and laughing inappropriately, and she further alleged that he seemed confused, could not remember the names of family members who were present and was unable to maintain a conversation.
When the evidence regarding decedent's condition in the few weeks prior to his execution of the will and the related estate planning documents — including his memory loss, inability to remember names, increasing struggles with the activities of daily living and inappropriate behavior at Giaquinto's funeral — is viewed in the light most favorable to respondent, as the party opposing summary judgment, it is sufficient to show the existence of a triable issue of fact regarding decedent's testamentary capacity (see Matter of Paigo, 53 AD3d at 839; Matter of Brower, 4 AD3d 586, 588-589 [2004]; Matter of Buchanan, 245 AD2d at 645-646). We emphasize that when considering summary judgment motions, we must "focus on issue finding rather than issue determination, and deny the drastic remedy of summary judgment if there is any doubt as to whether a material factual issue exists or if such an issue is even arguable" (Lacasse v Sorbello, 121 AD3d 1241, 1242 [2014] [internal quotation marks and citation omitted]). The majority engages in issue determination rather than issue finding by focusing on the strength of petitioner's prima facie showing of entitlement to summary judgment and by emphasizing the credibility of petitioner's witnesses, while ignoring the evidence that is favorable to respondent. Notably, the majority fails to consider the facts contained in decedent's medical records and respondent's testimony regarding decedent's behavior at Giaquinto's wake. Although Carl Linkinhoker, a close friend of decedent, testified that decedent was appropriately sad and quiet, the existence of contrary testimony regarding decedent's behavior so close in time to execution of the will illustrates the existence of a factual issue that cannot be properly resolved as a matter of law.
We further note that by concluding that evidence of decedent's conduct during the time the estate plan revisions were under consideration within days of the will's execution was not sufficient to establish an issue of fact, the majority unduly raises the bar for demonstrating a triable issue regarding capacity. The majority's position will require evidence of a decedent's condition and conduct limited to the precise time that a will is executed, to the exclusion of contemporaneous relevant facts probative of capacity. Moreover, evidence regarding a decedent's conduct at the time of execution will almost always be within the control of the proponent of a will. Thus, we find that Surrogate's Court erred in granting that part of [*7]petitioner's motion dismissing respondent's objection based on the lack of testamentary capacity.
Mulvey, J., concurs.
ORDERED that the decree and order are affirmed, with costs.



Footnotes

Footnote 1: With the exception of one individual who had passed away, the contingent beneficiaries from the 2003 will were all included in the 2013 will. Significantly, respondent was omitted from both wills.

Footnote 2: Respondent subsequently withdrew her further objection that the 2013 will had not been duly executed by decedent.